# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 08-1491

_____

Ashley County, Arkansas; Benton
County, Arkansas; Cleburne
County, Arkansas; Faulkner
County, Arkansas,

Plaintiffs,

Independence County, Arkansas;
Chicot County, Arkansas; Conway
County, Arkansas; Cross County,
Arkansas; Fulton County,
Arkansas; Jackson County,
Arkansas; Lawrence County,
Arkansas; Izard County, Arkansas;
Monroe County, Arkansas; Nevada
County, Arkansas; Pulaski County,
Arkansas; Sevier County, Arkansas;
Sharp County, Arkansas; Stone
County, Arkansas; Woodruff
County, Arkansas; Union County,
Arkansas,

Plaintiff-Appellants,

v.

Pfizer, Inc.; PDK Labs, Inc.;
Warner Lambert Company, LLC;
Johnson & Johnson; Perrigo
Company; John Does, 1 through 10,

Defendant-Appellees.

Appeal from the United States
District Court for the
Eastern District of Arkansas.

[PUBLISHED]

_____

Submitted: September 22, 2008
Filed: January 5, 2009
_____

Before RILEY, HANSEN, and MELLOY, Circuit Judges.
_____

HANSEN, Circuit Judge.

Twenty individual counties in Arkansas brought this civil suit against Pfizer, Inc., PDK Labs, Inc., Warner Lambert Company, LLC, Johnson & Johnson, Perrigo Company, and various John Does (collectively "Defendants"),[1] each of whom manufactures or distributes products containing ephedrine or pseudoephedrine. The complaint sought compensation to recoup the costs expended by the counties in dealing with the societal effects of the methamphetamine epidemic in Arkansas, with liability premised on the use of the Defendants' products in the methamphetamine manufacturing process. Sixteen of the counties (collectively "Counties") appeal the district court's[2] order granting the Defendants' motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, and we affirm.

_____

[1]The original complaint filed in Arkansas state court also named American Novelties; Cliff McQuay, Cliff McQuay, Jr. and Ellen McQuay, d/b/a/ Cliff McQuay Sales Company; and Jr. Food Mart of Arkansas, Inc. as defendants. These defendants were severed from the case when it was removed to federal court, and they were neither parties to the case in district court, nor are they parties to this appeal.

[2]The Honorable William R. Wilson, United States District Judge for the Eastern District of Arkansas.

I.

Because we are reviewing a judgment granted on the pleadings, we view all the facts pleaded by the Counties, the nonmovants, as true, and we make all reasonable inferences in the Counties' favor. Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008). Methamphetamine is a highly addictive, synthetic drug that, according to the Counties, cannot be manufactured, or "cooked," without either ephedrine or pseudoephedrine. In Arkansas, methamphetamine is manufactured primarily in small toxic labs ("STLs") located in homes, tents, barns, or hotel rooms. According to the Counties, Arkansas has one of the highest numbers of STLs in the nation. The manufacturing process is dangerous, often resulting in explosions, chemical burns, chemical spills, and toxic fumes. The Counties allege that they have spent significant amounts of taxpayer dollars combating the manufacture of methamphetamine, including law enforcement costs to locate, eliminate, and clean up STLs where the methamphetamine is manufactured; prison and jail costs to house illegal users, dealers, and manufacturers; addiction treatment costs for users and addicts; costs to family service agencies for housing and treating children whose parents are arrested for methamphetamine-related charges; and costs for treating the physical side effects of methamphetamine use and exposure to its production.

The Defendants are manufacturers and distributors of over-the-counter cold and allergy medications containing either ephedrine or pseudoephedrine. None of the Defendants are retailers, nor do they sell the medications directly to the public. The Counties allege that the Defendants marketed and sold their products in Arkansas knowing that the products were being used illegally to manufacture methamphetamine.[3] The Counties allege that the Defendants knew that their products

---

[3]In their briefs to this court, the Counties allege that the Defendants intentionally targeted methamphetamine cooks by printing "pseudoephedrine" on the outside packaging of their cold medicines. These allegations were not included in the complaint, by which we are constrained in reviewing this dismissal on the pleadings.

were being used illegally at least as early as 1986 when the federal Drug Enforcement Administration (DEA) began pushing for controls over the sale of products containing ephedrine or pseudoephedrine. During two different time periods, in 1995-1996 and in 1998-1999, the DEA placed restrictions on the importation of bulk ephedrine and tracked the sales of ephedrine and pseudoephedrine outside of "blister packs." According to the Counties, methamphetamine use and abuse declined dramatically during these time periods, but the Defendants allegedly fought to create loopholes in the regulations to continue reaping large profits in the sale of their products. In time, the Counties say, methamphetamine cooks learned how to exploit the loopholes, and methamphetamine use rose again.

The Counties claim that the Defendants knew of measures they could have voluntarily taken to reduce the availability of their products to methamphetamine cooks but consciously chose not to, fighting regulatory efforts in order to continue reaping large profits. The actions that the Defendants (who are manufacturers and wholesalers) allegedly should have voluntarily taken included directing the retailers to place the products behind the counter of retail stores; requiring the retailers to make retail purchasers sign for products when purchased from the retailer; educating the retailers and their employees about suspicious behavior by persons seeking to purchase the products for illegal use; requiring the retailers to lock the products in display cases; and requiring the retailers to limit the amount of product that could be purchased at retail by an individual during a specified period of time. These measures were eventually included in DEA regulations issued in 2005. The Counties also alleged that two of the Defendants, Warner Lambert and Pfizer, developed effective alternative cold medications that did not contain ephedrine or pseudoephedrine and that could not be used to produce methamphetamine, but that neither of them brought the alternative products to market.

---

In any event, the Counties do not dispute that the packaging complied with the federal Food and Drug Administration regulations.

The Counties assert that the Defendants knew they were selling far more than the legitimate market for their products consumed as evidenced by the fact that the revenues of one of the Defendants, Perrigo, declined rapidly from $182 million to $30 million once regulations were passed in 2005 limiting access to the Defendants' products. The Counties also allege that the DEA sent letters to some of the Defendants warning them that their products were being used to make methamphetamine and that an executive from Pfizer admitted that the pharmaceutical industry was responsible for a portion of the methamphetamine problem in the United States. The Counties do not allege, however, that any of the Defendants violated any federal or state regulation governing the manufacture, distribution, packaging, or sale of their products. Nor do the Counties dispute that the sale of products containing ephedrine and pseudoephedrine is heavily regulated by both state and federal agencies.

The Counties sought damages under four different causes of action: common law unjust enrichment; the Arkansas Deceptive and Unconscionable Trade Practices Act (ADTPA), see Ark Code Ann. § 4-88-107; common law nuisance; and the Arkansas crime victims civil liability statute, see Ark. Code Ann. § 16-118-107. The District Court granted the Defendants' motion for judgment on the pleadings,[4] and the Counties appeal.

---

[4]We reject the Counties' claim that the district court inappropriately applied the summary judgment standard rather than the standard applicable to a judgment on the pleadings. Although the one-page Judgment referred to the Defendants' Motion for Summary Judgment, the 13-page Order correctly identified the motion as a Motion for Judgment on the Pleadings. Upon a careful review of the Order, we are satisfied that the district court properly limited its consideration to the facts alleged in the pleadings and correctly applied the standard applicable to a Rule 12(c) motion.

II.

The Counties filed their case in Arkansas state court, and the Defendants removed it to federal court based on diversity of citizenship. 28 U.S.C. § 1332. We therefore apply federal procedural rules, see Scenic Holding, LLC v. New Bd. of Trustees of Tabernacle Missionary Baptist Church, Inc., 506 F.3d 656, 665 (8th Cir. 2007), but Arkansas substantive law, see Bores v. Domino's Pizza, LLC, 530 F.3d 671, 674 (8th Cir. 2008). The district court granted judgment on the pleadings under Federal Rule of Civil Procedure 12(c), which required the court to "accept as true all factual allegations set out in the complaint" and to "construe the complaint in the light most favorable to the plaintiff[s], drawing all inferences in [their] favor." Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law," id., the same standard used to address a motion to dismiss for failure to state a claim under Rule 12(b)(6), see Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). "Because this is a diversity case, we interpret [Arkansas] law in determining whether the elements of the offenses have been pled." Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc., 406 F.3d 1052, 1062 (8th Cir. 2005). We review the district court's dismissal *de novo*. Wishnatsky, 433 F.3d at 610.

Our task in this diversity case is to apply Arkansas law and, where an issue has not been decided by the Supreme Court of Arkansas, to predict how it would decide the issue. See STL 300 N. 4th, LLC v. Value St. Louis Assocs., L.P., 540 F.3d 788, 792 (8th Cir. 2008). When state law is ambiguous or undeveloped, "we look to 'relevant state precedent, analogous decisions, considered dicta, and any other reliable data' to determine how the Supreme Court of [Arkansas] would construe [Arkansas] law." United Bank of Iowa v. Indep. Inputs (In re W. Iowa Limestone, Inc.), 538 F.3d 858, 866 (8th Cir. 2008) (quoting HOK Sport, Inc. v. FC Des Moines, L.C., 495 F.3d 927, 935 (8th Cir. 2007)). The Supreme Court of Arkansas has not addressed the

issue of whether manufacturers of products containing pseudoephedrine should be responsible for the societal costs associated with the methamphetamine epidemic based on the use of their products in the manufacture of methamphetamine (nor has any other jurisdiction that we could find), so we proceed to review the specific causes of action under Arkansas law.

A.    Unjust Enrichment

The Counties claim that the Defendants were unjustly enriched at the Counties' expense when methamphetamine cooks purchased the Defendants' products for use in the illegal manufacture of methamphetamine.  Unjust enrichment is an equitable doctrine that allows a party to recover for benefits conferred on another.  It is restitutionary in nature and focuses on the benefit received.  See Dews v. Halliburton Indus., Inc., 708 S.W.2d 67, 69 (Ark. 1986).  It is not enough, however, to establish a benefit received by another party.  "There must also be some operative act, intent, or situation to make the enrichment unjust and compensable."  Id.  Further, a party "who is free from fault cannot be held to be unjustly enriched merely because [it] has chosen to exercise a legal or contractual right."  Varner v. Peterson Farms, 371 F.3d 1011, 1018 (8th Cir. 2004) (applying Arkansas law and citing Guaranty Nat'l Ins. Co. v. Denver Roller, Inc., 854 S.W.2d 312, 317 (Ark. 1993)); see also Westside Galvanizing Servs., Inc. v. Ga.-Pac. Corp., 921 F.2d 735, 740 (8th Cir. 1990) (applying Arkansas law and holding that a contractor who exercised his legal right to setoff was not unjustly enriched).

The Counties believe they have stated a claim for unjust enrichment by establishing that the Defendants were enriched by selling their products, that the enrichment was unjust because the sales allegedly violated the law and public policy of Arkansas related to manufacturing methamphetamine, and that the Counties are entitled to compensation related to services provided in dealing with the methamphetamine epidemic.  Unjust enrichment is based on an implied contract

theory of recovery, however, and Arkansas courts "will only imply a promise to pay for services where they were rendered in such circumstances as authorized the party performing them to entertain a reasonable expectation of their payment by the party beneficiary." Dews, 708 S.W.2d at 69. The Counties did not provide the services for which they now seek compensation, i.e., law enforcement, inmate housing, social services, and treatment, with the expectation that the Defendants–manufacturers and wholesalers of products containing pseudoephedrine–would pay for those services. In other words, the cold medicine manufacturers cannot be said to be the beneficiaries of the services provided by the Counties. The circumstances connecting the sales of cold medication to the provision of these government services are simply too attenuated to give rise to an implied contract between the manufacturers and the county providers to state a cause of action for unjust enrichment.

### B. Nuisance and Statutory Claims–Proximate Cause

The remaining three causes of action asserted by the Counties include common law nuisance, liability for violating the ADTPA, and liability under Arkansas's crime victims civil liability statute. To state a cause of action for nuisance in Arkansas, the "the nuisance must . . . be the natural and proximate cause of the injury." Taylor Bay Protective Ass'n v. Adm'r, U.S. E.P.A., 884 F.2d 1073, 1077 (8th Cir. 1989) (internal marks omitted) (applying Arkansas law). The ADTPA makes it unlawful to engage in "any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade," Ark. Code Ann. § 4-88-107(a)(10), and it grants a private cause of action to "[a]ny person who suffers actual damage or injury *as a result of* an offense or violation as defined in this chapter," id. § 4-88-113(f) (emphasis added). The crime victim's civil liability statute provides a civil cause of action to "[a]ny person injured or damaged *by reason of* conduct of another person that would constitute a felony under Arkansas law." Id. § 16-118-107(a)(1) (emphasis added). By allowing for recovery only when the injury is "a result of" an ADTPA violation, see § 4-88-113(f), or "by reason of" another person's felonious actions, see § 16-118-107(a)(1), each of

the Arkansas statutes at issue necessarily includes a proximate cause element, <u>see</u> <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 456-57 (2006) (construing a statutory element granting a civil cause of action to persons injured "by reason of" a RICO violation as a proximate cause requirement). Thus, we turn our focus to the common element of each of these causes of action–proximate cause.

In Arkansas, proximate cause is "defined as 'that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury, and without which the result would not have occurred.'" <u>City of Caddo Valley v. George</u>, 9 S.W.3d 481, 487 (Ark. 2000) (quoting <u>Union Pac. R.R. v. Sharp</u>, 952 S.W.2d 658, 662 (Ark. 1997)). Proximate cause encompasses two distinct aspects: cause in fact and legal cause. <u>See</u> <u>Chambers v. Stern</u>, 64 S.W.3d 737, 744 (Ark.) ("[A] plaintiff must show causation in fact and legal causation."), <u>cert.</u> <u>denied</u>, 536 U.S. 940 (2002). Cause in fact addresses whether, as a matter of fact, an injury followed from a particular action. Legal cause addresses the separate issue of how far legal responsibility should extend for a party's actions. <u>See</u> W. Keeton, Prosser & Keeton on Torts § 41, at 264 (5th ed. 1984) ("As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability."). While proximate cause is generally a fact issue to be decided by a jury, it becomes a question of law for the court when reasonable minds could not differ. <u>Wilson v. Evans</u>, 679 S.W.2d 205, 206 (Ark. 1984) (reversing jury verdict where there was no causal connection between two accidents occurring five months apart); <u>cf.</u> <u>Young v. Bryco Arms</u>, 821 N.E.2d 1078, 1086 (Ill. 2004) ("[T]he lack of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause.").

Arkansas common law incorporates the doctrine of intervening acts, which reflects the limits that society places on a defendant's liability for his actions. An "'original act . . . is . . . eliminated as a proximate cause by an intervening cause [if]

the latter is of itself sufficient to stand as the cause of the injury,'" and the intervening act is "'*totally independent*'" of the original act. City of Caddo Valley, 9 S.W.3d at 487 (quoting Hill Constr. Co. v. Bragg, 725 S.W.2d 538, 540 (Ark. 1987)). An intervening act will not relieve the original actor of liability if the injury is the natural and probable consequence of the original act and the injury "might reasonably have been foreseen as probable." Shannon v. Wilson, 947 S.W.2d 349, 356 (Ark. 1997). Foreseeability is a critical aspect of the legal causation inquiry. See id.; Larson Mach., Inc. v. Wallace, 600 S.W.2d 1, 11 (Ark. 1980) (reversing jury verdict against machine manufacturer where dealer's act of removing safety shield from fertilizer spreader was not foreseeable to the manufacturer, such that dealer's removal of shield prior to selling spreader to farmer was an efficient intervening cause to preclude imposing liability on the manufacturer for farmer's injury); cf. Young, 821 N.E.2d at 1086 ("Legal cause involves an assessment of foreseeability . . . "). Likewise, an original action can be too remote or indirect to be considered the legal cause of a subsequent injury. See State Farm Mut. Auto. Ins. Co. v. Pharr, 808 S.W.2d 769, 772 (Ark. 1991) (noting that an action can be too remote to be considered the proximate cause of an injury); see also Lovell v. Brock, 952 S.W.2d 161, 166 (Ark. 1997) (holding that the act of the individual hunter who accidentally shot a member of his hunting group was the direct cause of death to the victim, breaking any causal chain between other hunters' illegal use of dogs and the resulting shooting incident).

The original act alleged here is the Defendant manufacturers' sales of cold medicine containing pseudoephedrine to retail establishments, with the knowledge that methamphetamine cooks purchase the cold medicine (or obtain it illegally) from the retailers and use it to manufacture methamphetamine, combined with the Defendants' refusal to implement measures to limit access to their products for illegal use. The intervening causes asserted by the Defendants include: the conduct of the independent retailers in selling the products; the illegal conduct of methamphetamine cooks purchasing the cold medicine along with numerous other items with the intent to manufacture methamphetamine; the illegal conduct of cooking the items into

-10-

methamphetamine; and the illegal conduct of distributing the methamphetamine to others in Arkansas. The alleged injury is the cost to the Counties of providing government services to deal with the methamphetamine epidemic in Arkansas: expenditures related to law enforcement, inmate housing, treatment, and family services. The question then is whether the intervening causes are the natural and probable consequences of the Defendants' sales of cold medicine to retail stores and whether the Counties' expenditures for government services to deal with the methamphetamine epidemic "might reasonably have been foreseen [to the cold medication manufacturers] as probable." Shannon, 947 S.W.2d at 356.

The Counties assert that the district court erred in dismissing the suit on the pleadings, arguing that but for the Defendants' sale of cold medicine containing pseudoephedrine, the cooks could not have made methamphetamine in such large quantities, and the Counties would not have needed to provide additional government services to deal with the methamphetamine-related problems. Although this line of reasoning may arguably satisfy the cause in fact prong of proximate cause, it does not address the separate issue of legal causation. Arkansas courts have dismissed actions on the pleadings based on a lack of proximate cause where the facts fail to meet the legal causation standard. In Hartsock v. Forsgren, Inc., 365 S.W.2d 117, 118-19 (Ark.1963), for example, the Supreme Court of Arkansas affirmed a demurrer for lack of proximate cause where a boy was burned after his parents used gasoline in an attempt to remove tar from his feet. The defendant had allowed tar to overflow onto a playground, and the boy walked in it. As the boy's parents attempted to clean the tar off his feet with gasoline in their backyard, another boy shot a cap gun, creating a spark that ignited the gasoline and burned the boy. Although the boy would not have been burned but for getting tar on his feet, the supreme court concluded that the facts alleged in the complaint failed as a matter of law to establish legal causation as against the defendant who was responsible for the tar. The court focused on the intervening action of the parents in introducing the gasoline that caused the injury. Id. at 119. Here, the Counties do not dispute the facts underlying the alleged

-11-

intervening acts, only whether those acts are sufficient to supersede the Defendants' actions as the proximate cause of the Counties' injuries.

We have located no published decisions from any jurisdiction addressing a pharmaceutical manufacturer's civil liability for government services stemming from the use of pseudoephedrine to manufacture methamphetamine where liability is premised on the manufacturer's sale of products containing pseudoephedrine through legal retail channels. The liability that the Counties attempt to impose on the manufacturers in this case is analogous, however, to cases seeking to impose liability on gun manufacturers for government services provided to address the hazards of illegally possessed guns.

In one analogous gun case, the Third Circuit held that under Pennsylvania law, a city could not maintain an action for public nuisance or negligence against a gun manufacturer to recover for the city's costs in combating crime involving the illegal use or possession of guns. See City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 426 (3d Cir. 2002). There, the City of Philadelphia brought suit against gun manufacturers, alleging that the manufacturers' conduct in the marketing and distribution of handguns allowed the guns to fall into the hands of criminals, creating and contributing to their criminal use in Philadelphia. Id. at 419. The City sought compensation for its claimed injuries, which included the costs associated with preventing and responding to incidents of gun violence and crime. The Third Circuit held that the City's negligence claim failed for a lack of proximate cause because the injury to the City was too remote from the gun manufacturer's alleged conduct of failing to adopt policies that would restrict the activities of the federally licensed firearms dealers when the manufacturers had knowledge that some guns reached the hands of prohibited persons. Id. at 423-25. Other jurisdictions have applied similar reasoning. Where "the defendants' business practices merely create a condition that makes the eventual harm possible," the "defendants' conduct cannot constitute a legal cause of the alleged harm." Young, 821 N.E.2d at 1091 (affirming dismissal on the

-12-

pleadings in a claim brought by victims of gun violence against gun manufacturers for a lack of probable cause); see also District of Columbia v. Beretta, U.S.A., Corp., 872 A.2d 633, 650-51 (D.C.) (refusing to judicially adopt "a right of action for public nuisance applied to the manufacture and sale of guns generally"), cert. denied, 546 U.S. 928 (2005).

The allegations in the Third Circuit case are nearly identical to the allegations here–that the Defendant manufacturers failed to take steps to restrict access to the products containing pseudoephedrine when they knew (an alleged fact we take as true at the judgment on the pleadings stage) that the pseudoephedrine-containing products were being purchased and used illegally to make methamphetamine. Critical to the Third Circuit's analysis was the "long and tortuous" route the guns took from the manufacturers, who complied with the law in selling the guns, to the streets of Philadelphia. City of Philadelphia, 277 F.3d at 423. Additionally, the court noted the lack of intent by the manufacturers to harm the citizens of Philadelphia, the derivative nature of the City's injuries, and the speculative nature of the City's claimed injuries, stemming from the difficulty in assessing how many incidents of gun violence could have been avoided had the gun manufacturers taken the suggested precautions. Id. at 424-25. Important to the court's analysis was the fact that the gun manufacturers' actions are regulated and that they shipped the guns to independent, licensed distributors and dealers before the guns reached the illegal market. Id. at 424. Again, the same is true here. The sale of products containing pseudoephedrine is–and was at the time alleged in the complaint–highly regulated, and the Defendants sold their products to legitimate independent retailers prior to the products reaching the hands of the methamphetamine cooks.

We recognize that not all jurisdictions to address the liability of gun manufacturers have taken the same approach as the Third Circuit of dismissing cases at the pleading stage. See Camden County Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp., 273 F.3d 539, 540 (3d Cir. 2001) (noting that although "a majority of

courts have rejected [tort claims against handgun manufacturers] as a matter of law," a few courts in factually distinguishable cases did not dismiss the claims outright); James v. Arms Tech., Inc., 820 A.2d 27, 33-34 & nn.2-3 (N.J. Super. Ct. 2003) (discussing approaches taken by various courts in similar cases). We are mindful that we must apply the law of Arkansas and, where that law is not clear, apply the law as we predict the Arkansas courts would apply it. The only word from the Arkansas courts in this analogous gun situation comes from the Supreme Court of Arkansas's rejection of attempts to hold a gun manufacturer liable for negligence based solely on the ultimate use of the gun to harm another person where the manufacturer had no control over how the retailer sold its product. See First Commercial Trust Co. v. Lorcin Eng'g, Inc., 900 S.W.2d 202, 205 (Ark. 1995); Franco v. Bunyard, 547 S.W.2d 91, 93 (Ark.), cert. denied, 434 U.S. 835 (1977); see also First Commercial Trust Co., N.A. v. Colt's Mfg. Co, 77 F.3d 1081, 1083 (8th Cir. 1996) (applying Lorcin and affirming Rule 12(b)(6) dismissal of an Arkansas negligence claim against gun manufacturer premised on manufacturer's failure to develop a safe-sales policy or train retailers to avoid sales to "probable misusers" of handguns). In Lorcin, the estate of a gun violence victim brought a negligence claim against the gun manufacturer premised on the manufacturer's promotion of its .380 handgun to a market it knew or should have known included persons who would use the gun illegally and its negligence in failing to provide its distributors with a safe-sales policy. The Lorcin court concluded that the gun manufacturer owed no duty to the victim of a gun shooting because no special relationship existed upon which to base the duty, specifically noting that the manufacturer had no control over its dealers. Lorcin, 900 S.W.2d at 204-05 (relying on District of Columbia and Illinois cases). The independence of the retailer was also critical to the court's conclusion in Franco that the manufacturer should not be held civilly responsible for injuries stemming from actions outside the manufacturer's control, see 547 S.W.2d at 93, similar to the reasoning applied by the Third Circuit in City of Philadelphia, 277 F.3d at 424.

-14-

Although these cases rely on the lack of a duty owed to support a tort claim, they are instructive on the issue of proximate cause. There is a "link between the questions of the existence of a duty and the existence of legal cause" because "[b]oth depend on an analysis of foreseeability." City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099, 1136 (Ill. 2004) (analyzing the relationship between duty and legal cause in a gun case brought by the City of Chicago premised on the gun dealers' alleged intent to market guns to facilitate their unlawful use). We also note that the Supreme Court of Arkansas in Lorcin relied on cases from Illinois and the District of Columbia, see Lorcin, 900 S.W.2d at 204 (discussing Delahanty v. Hinckley, 564 A.2d 758 (D.C. 1989); id. at 205 (discussing Riordan v. Int'l Armament Corp., 477 N.E.2d 1293 (Ill. Ct. App. 1985)), both jurisdictions that have rejected attempts to hold gun manufacturers liable to victims of gun violence based on a lack of proximate cause, see Beretta, U.S.A., Corp., 872 A.2d at 650-51; Young, 821 N.E.2d at 1091.

The criminal actions of the methamphetamine cooks and those further down the illegal line of manufacturing and distributing methamphetamine are "sufficient to stand as the cause of the injury" to the Counties in the form of increased government services, and they are "totally independent" of the Defendants' actions of selling cold medicine to retail stores, City of Caddo Valley, 9 S.W.3d at 487 (internal marks omitted), even if the manufacturers knew that cooks purchased their products to use in manufacturing methamphetamine, see City of Chicago, 821 N.E.2d at 1136-37. Arkansas law will not support a conclusion that the "natural and probable consequences," Shannon, 947 S.W.2d at 356, of manufacturers selling cold medicine to independent retailers through highly regulated legal channels is that the cold medicine will create a methamphetamine epidemic resulting in increased government services, cf. City of Gary ex rel. King v. Smith & Wesson Corp., 801 N.E.2d 1222, 1244 (Ind. 2003) ("As a matter of law, in the absence of other facts, it is not a natural and probable consequence of the lawful sale of a handgun that the weapon will be used in a crime.").

As in the analogous gun cases, "[t]he Count[ies] make[] no allegation that any manufacturer violated any federal or state statute or regulation governing the manufacture and distribution of [pseudoephedrine], and no direct link is alleged between any manufacturer and any specific criminal act." Camden County Bd. of Chosen Freeholders, 273 F.3d at 539 (affirming dismissal of nuisance claim for failure to state a claim brought against gun manufacturers based on their alleged contribution to the illegal gun market). They argue instead that the manufacturers failed to take voluntary restrictive measures before those measures were required by regulation and that they actively lobbied against implementation of the regulations. Even if liability could be premised on the failure to take voluntary action, each of the suggested actions are actions that required implementation at the independent retail sales level. The Counties do not allege that the retailers were not independent of the manufacturers or that the manufacturers had sufficient control over the retailers that the manufacturers could require the retailers to implement the suggested measures. Given the Arkansas courts' reliance on the independence of retailers in the gun manufacturing setting, see Lorcin, 900 S.W.2d at 204; Franco, 547 S.W.2d at 93, we predict that the Arkansas courts would not impose liability on these manufacturers based on actions that could only be taken by the independent retailers, putting aside the fact that the measures were not then required in the highly regulated industry.[5]

---

[5]The allegation made in the briefs that the manufacturers marketed the products to the methamphetamine cooks by placing the word "pseudoephedrine" prominently on the packaging does not change the analysis. The products were still sold to independent retailers, and these alleged marketing methods did not change the fact that the methamphetamine cooks still had to obtain the products through the retailers. See Lorcin, 900 S.W.2d at 203 (rejecting nuisance claim premised in part on manufacturer's promotion of its handgun to a market it knew included persons likely to misuse the handgun); Camden County Bd. of Chosen Freeholders, 273 F.3d at 539, 541 (rejecting a nuisance claim brought by a county against a gun manufacturer who allegedly advertised handguns in such a way as to facilitate their use by criminals).

Proximate cause is bottomed on public policy as a limitation on how far society is willing to extend liability for a defendant's actions. As a federal court construing state law, we are very reluctant to open Pandora's box to the avalanche of actions that would follow if we found this case to state a cause of action under Arkansas law. We could easily predict that the next lawsuit would be against farmers' cooperatives for not telling their farmer customers to sufficiently safeguard their anhydrous ammonia (another ingredient in illicit methamphetamine manufacture) tanks from theft by methamphetamine cooks. And what of the liability of manufacturers in other industries that, if stretched far enough, can be linked to other societal problems? Proximate cause seems an appropriate avenue for limiting liability in this context, as in the gun manufacturer context, particularly "where an effect may be a proliferation of lawsuits not merely against these defendants but against other types of commercial enterprises–manufacturers, say, of liquor, anti-depressants, SUVs, or violent video games–in order to address a myriad of societal problems regardless of the distance between the 'causes' of the 'problems' and their alleged consequences." Beretta, U.S.A., Corp., 872 A.2d at 651 (internal marks omitted); see also City of Chicago, 821 N.E.2d at 1138 ("In the present case, the consequences of imposing a duty upon the dealer defendants to prevent the creation of a public nuisance in the city of Chicago by those intent on illegally possessing and using guns in the city are equally far-reaching. The same concerns underlie our conclusion that it is inadvisable as a matter of public policy to deem the dealer defendants' actions a legal cause of the alleged nuisance.")

The Counties assert that this situation is different from the gun cases from other jurisdictions based on two unique Arkansas statutes: the Drug Dealer Liability Act, Ark. Code Ann. § 16-124-101 to § 16-124-112, and the crime victims civil liability statute, id. § 16-118-107, which allegedly set this case apart from analogous cases brought under common law theories of liability. Neither of these statutes convinces us that the Arkansas courts would extend civil liability as a matter of public policy to the pharmaceutical manufacturers in this case. The Drug Dealer Liability Act is

premised on "damages caused by use of an illegal drug by an individual," § 16-124-104(a), with the individual drug user being critical to the Act's provisions, see id. § 16-124-104(a)(4) (granting a cause of action to a "governmental entity . . . that funds a drug treatment program . . . *for the individual drug user* or that otherwise expended money *on behalf of the individual drug user*" (emphasis added)); § 16-124-102(4) (defining "individual drug user" as "the individual whose illegal drug use is the basis for an action brought under this chapter"). The Counties' assertion that this Act establishes a public policy holding manufacturers of products containing pseudoephedrine liable for societal costs, as opposed to costs related to individual drug users, is unavailing.

Arkansas's crime victims civil liability statute fares no better. That statute provides a civil cause of action to "[a]ny person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law." Ark. Code Ann. § 16-118-107(a)(1). The Counties claim that the Defendants' actions constitute the felony of selling or distributing a product containing ephedrine or pseudoephedrine "with reckless disregard as to how the product will be used." See Ark. Code Ann. § 5-64-1102(b)(1)(B). Subsection (b) was added to § 5-64-1102 in 2001, see 2001 Ark. Acts, Act 1209, § 4, by the same Act in which the Arkansas legislature added § 5-64-1103, see 2001 Ark. Acts, Act 1209, § 5, limiting retail sales of products containing pseudoephedrine to no more than three packages. Thus, at the same time that the Defendant manufacturers allegedly became subject to criminal liability based on their reckless disregard for how their products were being used, those same products could be sold by retailers in very limited quantities (one of the measures the Counties asserted the Defendants should have taken voluntarily). The Counties do not allege that the retailers to whom the Defendant manufacturers sold their cold medications failed to comply with this statute, or any other statute or regulation governing the sale of products containing pseudoephedrine. Given the Arkansas legislature's focus on curtailing the availability of products from legitimate retail sources, we cannot agree with the Counties that Arkansas courts would extend

-18-

civil liability to manufacturers who sell their pseudoephedrine-containing products to independent retailers, who in turn are limited in their sales of the products. In any event, as previously discussed, the statutory civil cause of action includes an element of proximate cause, which we have found lacking as a matter of law.

The Counties cite no case, federal or state, that recognizes a cause of action available to a government entity to recover against pharmaceutical manufacturers for the legal sale of products containing pseudoephedrine based on the subsequent use of the product in the manufacture of methamphetamine. "[I]t is not the role of a federal court to expand state law in ways not foreshadowed by state precedent," City of Philadelphia, 277 F.3d at 421; see also Trimble v. Asarco, Inc., 232 F.3d 946, 963 (8th Cir. 2000) (refusing to expand Nebraska law to recognize a cause of action previously unrecognized by Nebraska courts), and our review of related Arkansas case law does not foreshadow such an expansion. Because proximate cause is lacking, and because it is a necessary element of each of the three remaining causes of action alleged by the Counties, we need not address the remaining elements of the individual claims.

III.

Given the current state of the law in Arkansas, we affirm the district court's judgment.

_____