# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2636

_____

Paula Kingman; Calvin Kingman,      *
                                    *
        Plaintiffs - Appellees,     *
                                    *    Appeal from the United States
    v.                              *    District Court for the
                                    *    Western District of Missouri.
Dillard's, Inc.,                    *
                                    *
        Defendant - Appellant.      *

_____

Submitted: April 14, 2011
Filed: July 6, 2011

_____

Before WOLLMAN, GILMAN,[1] and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Paula Kingman ("Paula") brought this diversity action against Dillard's, Inc. ("Dillard's"), seeking damages for the injuries she sustained to her right shoulder when a high-hanging rack of apparel fell on her at a Dillard's store. Her husband, Calvin Kingman ("Calvin"), brought a claim for loss of consortium. Dillard's does not challenge the district court's liability finding with respect to Paula, but appeals the amount of the damages award. Dillard's also appeals the district court's judgment in

_____

[1]The Honorable Ronald Lee Gilman, United States Circuit Judge of the Court of Appeals for the Sixth Circuit, sitting by designation.

favor of Calvin on his loss-of-consortium claim. For the reasons stated below, we affirm in part and reverse in part.

## I. Background

On November 14, 2004, Paula was shopping at a Dillard's store when a high-hanging rack of apparel came loose from the wall and struck her on the right shoulder ("the Dillard's incident"). The district court found that she reached violently back to protect her face or avoid being buried in clothing, with the result that her right shoulder was twisted. Although no accident report was filed at Dillard's, Paula subsequently developed pain and went to a clinic where she was prescribed medication and a sling. Two days later, her doctor diagnosed "shoulder sprain/strain" and muscle spasm and prescribed a variety of pain medications as well as physical therapy. In spite of these treatments, Paula continued to experience pain and a reduced range of motion in her right shoulder. She also developed sensations of "popping" and "catching." On December 12, 2005, October 24, 2007, and February 29, 2008, Paula underwent three separate surgeries to cure her shoulder impingement, but postoperatively, her symptoms have persisted. Plaintiffs' expert, Dr. Swaim, concluded that, as of July 2008, Paula had "reached maximal medical improvement," that further surgeries would not improve the shoulder condition, and that going forward, Paula "will have ongoing right shoulder pain, popping, decreased motion, and weakness" and will require analgesics and anti-inflammatory medications indefinitely. Further, since May 17, 2007, three different doctors have advised that Paula's shoulder cannot tolerate lifting, pushing, or pulling her husband, Calvin, who is a 300-pound quadriplegic. Prior to this time, Paula was Calvin's primary care-giver, assisting him with bathing and dressing, feeding, urinary and bowel care, stretching to avoid contractures of joints, and, importantly, hoisting and turning him to prevent pressure ulcers.

Prior to the Dillard's incident, Paula had been involved in several accidents. First, in 1982, Paula suffered minor injuries in a car wreck—the same one that left Calvin a quadriplegic. On June 22, 1982, she saw a doctor who opined that the car accident had aggravated previous muscle injuries to her neck and lower back, and predicted that her neck and back pain would evolve into a chronic problem. As a result of the accident, Paula and Calvin filed a products liability suit against the car manufacturer. Calvin sought $33 million to cover, among other things, lifetime medical expenses, including nursing care, and Paula asked for $50,000 to cover past and future medical expenses. The case ultimately settled, with Calvin receiving approximately $1.3 million and Paula receiving approximately $50,000.

Second, on June 8, 1990, while at work, Paula tripped on a crack in the sidewalk, and fell on her right arm. In follow-up visits to doctors, she complained of recurrent pain and stiffness in her right elbow and shoulder, as well as a limited range of motion and weakness in the right upper extremity. She was diagnosed with a "myofascial dysfunction" and treated with pain medications and physical therapy. Paula and her employer disputed the nature and extent of any permanent disability, but on October 1, 1992, she received a worker's compensation award of $11,750, which reflected a settlement based on an approximate disability of fifteen percent permanent partial disability to the body as a whole, "referable to the neck and arm."

Third, on May 11, 2002, Paula was rear-ended and suffered whiplash-related injuries, including vertigo problems and muscle stiffness in her neck and upper back. Her lawsuit against the other driver settled for $25,000. Between May 2002 and August 2004, Paula was in and out of doctors' offices, complaining mainly of vertigo and dizziness, but also of stiffness and pain in her neck and upper back, for which she was prescribed physical therapy and pain medications. On August 9, 2004, she was taking between two and five tablets of Darvocet, a prescription pain medication, per day. A physical therapy report dated September 23, 2004, indicates that her pain was continuing and was aggravated by activities such as cleaning, vacuuming, grabbing,

and lifting. Nevertheless, a social worker's report dated November 8, 2004, indicates that at that time, she was continuing to act as Calvin's primary care-giver.

Paula filed this tort action against Dillard's in state court on August 24, 2005. After removal to the Western District of Missouri, the district court conducted a nine-day bench trial. The district court found Dillard's negligent and liable for any damages suffered as a result of its negligence. The court awarded Paula $186,388 in damages, comprised of $116,388 to cover the past and future costs of medication and medical services incurred in treating Paula's right shoulder since the Dillard's incident, and $70,000 for the disability itself, including pain and loss of use of the shoulder. Additionally, the court found in favor of Calvin on his loss-of-consortium claim and awarded him $1 million in damages to cover the cost of professional care-giver services for fifteen years—that is, until Paula reaches the age of sixty-two. Beyond that age, the court reasoned, Paula could no longer be expected to continue moving Calvin, even absent the Dillard's incident.

## II. Discussion

"After a bench trial, this court reviews the district court's findings of fact for clear error, and its legal conclusions de novo." Lisdahl v. Mayo Found., 633 F.3d 712, 717 (8th Cir. 2011) (citing Fed. R. Civ. P. 52(a)). "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Id. (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)). "[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). "A district court's choice between two permissible views of evidence cannot be clearly erroneous." Estate of Davis v. Delo, 115 F.3d 1388, 1393–94 (8th Cir. 1997).

## A. Paula's Damages

Dillard's contends that the district court erred in calculating Paula's damages because Paula's right shoulder was already damaged when the Dillard's incident occurred. According to Dillard's, the clothing rack caused no further harm for which Dillard's is responsible. Alternatively, Dillard's maintains that even if a portion of Paula's current shoulder injuries are attributable to the Dillard's incident, Dillard's is liable only for that portion of the total damages that were directly caused by the Dillard's incident, as opposed to preexisting injuries. Further, Dillard's believes that it was Paula's burden to demonstrate what proportion of her current injuries are attributable to the Dillard's incident, and that because she has not met that burden, her recovery is limited to nominal damages.

The district court rejected the theory that Paula's current shoulder problems are attributable to injuries that predated the Dillard's incident. According to Dr. Swaim and the district court, the Dillard's incident caused shoulder joint and muscle problems, which constituted a new injury. The district court credited Dr. Swaim's opinion that the 2002 accident caused nerve problems rather than structural damage to the shoulder muscles. Additionally, the district court rejected the hypothesis that Paula's long-term care-giving activities contributed to her current shoulder problems. With respect to the 1990 accident, the district court found that, although Paula sustained a shoulder injury in 1990, it healed and caused no further problems for more than a decade before the Dillard's incident. At most, according to the district court, Paula was left with a "predisposition" toward the kind of serious injury that resulted from the Dillard's incident. Thus, the district court found that Paula's shoulder muscle problems began in November 2004 and constituted a new injury wholly caused by the Dillard's incident. The district court concluded that "[e]ven if Paula Kingman was predisposed to injury in her right shoulder, . . . Missouri law . . . requires the tortfeasor to compensate her for resulting injury." Kingman v. Dillard's, Inc., No. 06-0907, 2010 WL 2710716, at *5 (W.D. Mo. July 7, 2010).

-5-

The district court did not err as a matter of law in concluding that even if Paula was predisposed to injury in her right shoulder, Dillard's is required to compensate her for the injuries she sustained on November 14, 2004. Under Missouri law, the plaintiff in a personal injury action "is not entitled to recover damages for conditions that are due entirely and wholly to previous disease or injuries," but "may recover for the aggravation of existing ailments caused by the negligent acts of [the] defendant." Schide v. Gottschick, 43 S.W.2d 777, 782 (Mo. 1931). The aggravation of existing ailments for which a plaintiff may recover includes "such damages as proximately result from the activation of dormant disease." Widener v. St. Louis Pub. Serv. Co., 230 S.W.2d 698, 701 (Mo. 1950) (citing Owen v. Dix, 196 S.W.2d 913, 915 (Ark. 1946) (disc in plaintiff's spine was diseased and hence weaker and more susceptible to rupture than a normal disc); Hackley v. Robinson, 219 N.W. 398, 398–99 (Iowa 1928) (car accident caused plaintiff's "dormant or inactive tuberculosis to become revivified")).

In Miller v. Gulf, Mobile & Ohio R.R. Co., 386 S.W.2d 97 (Mo. 1964), the Supreme Court of Missouri considered the case of an overweight fireman with a history of osteoarthritis in his left knee who slipped on a step attached to a fire engine and wrenched his left knee. After a long series of treatments and operation, the knee was left permanently damaged. At trial, the question was "whether or not the alleged fall aggravated the pre-existing conditions to any substantial extent, or whether plaintiff's subsequent and final condition was due to the natural progress of [the osteoarthritis, combined with the wear and tear of bearing the man's weight over a period of years]." Id. at 100. Reciting the rule that the "plaintiff could not recover damages on account of pre-existing diseases or for the normal development thereof," the Supreme Court of Missouri explained what this meant: while the plaintiff could not recover for the osteoarthritis "or for any damages resulting therefrom, and which are *not* the direct result of the [accident], . . . the plaintiff *could* recover for any damage resulting from prior conditions which *were* also the direct result of the [accident]." Id. at 102–03 (emphasis in original).

-6-

Applying Miller to the facts of our case, because the district court found that Paula's post-November 2004 shoulder problems were a direct result of the Dillard's incident, Paula was entitled to recover for those injuries. Even if Paula's 1990 shoulder injury left her right shoulder weaker than an ordinary person's, and thus more susceptible to serious injury, Dillard's is liable for the full measure of damages that resulted when the clothing rack struck her shoulder and, thereby, aggravated a condition that had been dormant for over a decade.

Regarding the attribution of Paula's present condition to the Dillard's incident, the district court's factual findings are supported by the evidence. In particular, the testimony of two orthopaedic surgeons who examined Paula support the district court's findings. Dr. Reardon, who performed the first two of Paula's three shoulder surgeries, explained that shoulder problems like Paula's could be caused by a blunt trauma. He was unable to determine whether the Dillard's incident was the sole cause of Paula's shoulder pain because he had not reviewed Paula's complete medical history. In his view, though, the Dillard's incident at least "significantly contributed" to that pain. Thus, Dr. Reardon's testimony is consistent with the district court's finding, based on its review of Paula's complete medical history, that the Dillard's incident was "the cause of [Paula's] generally constant shoulder muscle problems from 2004." Kingman, 2010 WL 2710716, at *2. This finding is also directly supported by the testimony of Dr. Swaim, who did review Paula's full medical history and concluded that the Dillard's incident "caused or was the prevailing factor to cause" all of Paula's shoulder joint problems and need for medical treatment of the shoulder since November 2004 and going forward. Thus, while it might be possible to draw a different conclusion from the evidence in the record, the district court's findings represent a "choice between two permissible views of evidence," and therefore cannot be clearly erroneous. See Estate of Davis, 115 F.3d at 1393–94.

Moreover, Dillard's is incorrect regarding the burden of proof. As the Supreme Court of Missouri explained in Miller, Paula was required to demonstrate only

"substantial evidence of aggravation." 386 S.W.2d at 102 ("The line between an aggravation and the normal progress of a chronic pathological condition may be a hazy one, but under our practice a jury is entitled to make the finding if there is substantial evidence of aggravation."). Once Paula satisfied the elements of her claim, the burden was on Dillard's to challenge the extent to which her injuries were directly attributable to its own negligence. Carlton v. Phillips, 926 S.W.2d 8, 12–13 (Mo. Ct. App. 1996) ("Once [the plaintiff] satisfied the elements of her claim, it becomes the burden of the individual defendants to challenge the extent of appellant's injuries directly attributable to their own negligence."); see also Sparks v. Ballenger, 373 S.W.2d 955, 958 (Mo. 1964) (holding that although a plaintiff "must . . . produce evidence from which a jury may draw an inference that the plaintiff was injured as a result of defendant's negligence," the plaintiff "need not with certainty or exactness prove the extent of his damages"). Thus, because neither party offered any evidence on how to apportion damages, it was Dillard's, and not Paula, who failed to meet its burden of proof.

Finally, the district court's holding is consistent with Missouri's conception of proximate causation. In Missouri, the plaintiff's "injury must be a reasonable and probable consequence of the act or omission of the defendant." Callahan v. Cardinal Glennon Hosp., 863 S.W.2d 852, 865 (Mo. 1993) (en banc). The Supreme Court of Missouri has explained that "[t]his is generally a 'look back' test but, to the extent it requires that the injury be 'natural and probable,' it probably includes a sprinkling of foreseeability." Id. Thus, the defendant is liable even for unusual injuries to the plaintiff if the defendant could have foreseen that an injury of some kind would result from his negligence. Id.; see also Robinson v. Mo. State Highway & Transp. Comm'n, 24 S.W.3d 67, 78 (Mo. Ct. App. 2000) ("[I]n order for an act to constitute the proximate cause of an injury, *some* injury, if not the precise one in question, must have been reasonably foreseeable." (internal quotation marks omitted)). This foreseeability threshold is met in the instant case because it was reasonably foreseeable that *some* injury, even if not a serious shoulder injury, might result from

-8-

a high-hanging clothing rack falling from the wall onto a customer.  Accordingly, we affirm the district court's award of $186,388 in damages to Paula.

## B.  Calvin's Damages

Dillard's makes several arguments in support of its contention that the district court erred in awarding $1 million to Calvin on his consortium claim.  First, Dillard's argues that Calvin's damages were not foreseeable and, therefore, not proximately caused by the Dillard's incident.  Second,  Dillard's contends that full-time nursing care is not the type of "service" that is encompassed by the notion of consortium.  Third, Dillard's asserts that, as a matter of Missouri law, a consortium award cannot be larger than the damages recovered by the injured party.

"Proximate cause requires something in addition to a 'but for' causation test to exclude causes upon which it would be unreasonable to base liability . . . because they are too far removed from the ultimate injury or damage."  Alcorn v. Union Pac. R.R. Co., 50 S.W.3d 226, 239 (Mo. 2001) (en banc) (internal quotation marks omitted).  As noted above, "[t]he general test for proximate cause is whether an injury is the natural and probable consequence of the defendant's negligence."  Stanley v. City of Independence, 995 S.W.2d 485, 488 (Mo. 1999) (en banc).  "An element of this examination is foreseeability, but with the advantage of hindsight."  Alcorn, 50 S.W.3d at 239.  "Foreseeability is not a matter of mathematical certainty.  No event is entirely foreseeable."  Robinson, 24 S.W.3d at 78 (internal quotation marks omitted).  "As such, the test for proximate cause is not whether a reasonably prudent person would have foreseen the particular injury, but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission of the defendant."  Id. (internal quotation marks omitted).  We do not believe it is entirely unforeseeable that an injured spouse might be married to an invalid, nor that an invalid's spouse might be acting as the invalid's primary care-giver.

Nevertheless, we agree with Dillard's that current Missouri law does not contemplate an unlimited consortium claim of the sort awarded to Calvin by the district court. "As a federal court, our role in diversity cases is to interpret state law, not to fashion it." Orion Fin. Corp. of S.D. v. Am. Foods Grp., Inc., 281 F.3d 733, 738 (8th Cir. 2002); see also Homolla v. Gluck, 248 F.2d 731, 734 (8th Cir. 1957) ("This Court is not an appellate court of the State of Missouri and establishes no rules of law for that State."). "When determining the scope of Missouri law, we are bound by the decisions of the Supreme Court of Missouri. If the Supreme Court of Missouri has not addressed an issue, we must predict how the court would rule, and we follow decisions from the intermediate state courts when they are the best evidence of Missouri law." Eubank v. Kan. City Power & Light Co., 626 F.3d 424, 427 (8th Cir. 2010) (internal citation omitted). No Missouri court has ever allowed a spouse to recover on a consortium claim for life-long professional nursing care. Indeed, as far as this court's research reveals, extending the law of consortium to embrace such a claim would be unprecedented nationwide.[2] Further, our review of related Missouri case law does not foreshadow such an expansion of the law of consortium, and "[i]t is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." Ashley Cnty. v. Pfizer, Inc., 552 F.3d 659, 673 (8th Cir. 2009) (internal quotation marks omitted).

---

[2]The only case we have encountered in which this theory was even advanced did not squarely address the issue. In Nichols v. Montgomery Ward Co., 489 P.2d 351 (Colo. App. 1971), an invalid wife claimed loss of consortium on the ground that her husband had been personally providing nursing care to her prior to his accident and became unable to continue doing so after the accident due to the worsening of his arthritic condition. The Colorado Court of Appeals affirmed the denial of the wife's consortium claim because the plaintiffs failed to prove that the development of the husband's arthritis was attributable to the accident as opposed to age and hereditary factors. Id. at 352–53. Thus, the Nichols court did not analyze the issue of whether the nursing services previously provided to the invalid wife by her now-injured husband would have been included in the wife's consortium claim.

"When a married person is injured, two causes of action arise: one accrues to the injured person for the injuries suffered directly by him or her, and the other accrues to the injured person's spouse for damages suffered as a result of the loss of the injured person's services, society, companionship, and sexual relations (loss of consortium)." Thompson v. Brown & Williamson Tobacco Corp., 207 S.W.3d 76, 112–13 (Mo. Ct. App. 2006) (internal quotation marks omitted). The cause of action for loss of consortium seeks to compensate the uninjured spouse for the "disruptive influence in the sphere of family and social life" caused by the negligently inflicted injury to his spouse. Helming v. Dulle, 441 S.W.2d 350, 355 (Mo. 1969). Thus, an uninjured husband can recover for the loss of his wife's share of "those mutual contributions that are normally expected in the maintenance of a household." Restatement (Second) of Torts § 693 cmt. f; see also Gooch v. Avsco, Inc., 340 S.W.2d 665, 670 (Mo. 1960) (allowing an uninjured husband to recover for his injured wife's future inability to perform her spousal "duties and obligations"). Missouri courts have recognized a variety of household and domestic duties as belonging to this category of "services" for whose loss the uninjured spouse may recover, including: housework, such as cooking, cleaning, sewing, and ironing; yard work and gardening; and assistance in raising and supervising children. See, e.g., Gooch, 340 S.W.2d at 670 (cooking, cleaning, sewing); Messina v. Prather, 42 S.W.3d 753, 758 (Mo. Ct. App. 2001) (housework, ironing, yardwork, cleaning, sewing, crocheting, knitting, cooking, gardening); O'Neal v. Agee, 8 S.W.3d 238, 242 (Mo. Ct. App. 1999) (raising and supervising children, repairing and maintaining house, yard, and automobiles).

Additionally, the uninjured spouse may recover on a consortium claim when the injury to the injured spouse requires the uninjured spouse to take on "varied and sundry duties" above and beyond the norm. Helming, 441 S.W.2d at 355 (explaining that "[t]aken together these varied and sundry duties now fall upon the wife and constitute a disruptive influence in the sphere of family and social life between the parties"); cf. Shepherd v. Consumers Coop. Ass'n, 384 S.W.2d 635, 640 (Mo. 1964) (en banc) (recognizing that an uninjured wife's consortium claim included the fact that

-11-

she was now required, due to her husband's injury, to remain at home for long periods of time and to forego social engagements she previously enjoyed). Some nursing care is "usually performed by and expected of a wife." See Hodges v. Johnson, 417 S.W.2d 685, 692 (Mo. Ct. App. 1967) (reducing the damages awarded in a consortium action in part because the uninjured spouse had not "administered any nursing care or services unto her husband other than those usually performed by and expected of a wife"). However, Missouri courts have allowed the uninjured spouse to recover for providing additional nursing services of the sort that professional care-givers ordinarily provide. See, e.g., Helming, 441 S.W.2d at 354–55 (permitting an uninjured wife to recover for the various new duties she was required to take on as a result of her husband's injury, including among other things, assisting him when he ate meals, shaving him, and buttoning his clothing); cf. Pretre v. United States, 531 F. Supp. 931, 936 (E.D. Mo. 1981) (holding that because the injured spouse was already receiving adequate nursing care from hospital staff, the uninjured wife's care-giving activities were superfluous—"done out of the extra measure of devotion that may be expected of a spouse"—and, therefore, could not be included in the wife's consortium claim); accord Wright v. Standard Oil Co., 470 F.2d 1280, 1292–93 (5th Cir. 1972) (applying Mississippi law and holding that a husband's consortium claim did not include the nursing services provided by his wife in the care of their paraplegic child because these activities "are far beyond those contemplated by the marital relationship" and "cannot be characterized as normal household and domestic duties which by entering into the marriage she impliedly agreed to perform without compensation," and thus "they exceed those [services] which the law includes under the consortium label"). These cases imply that professional nursing care is not included in the ordinary services that Missouri expects a wife to provide to her husband. Therefore, Missouri precedents do not foreshadow the extension of the law of consortium to encompass recovery for the loss of such services.

Further, the Kingmans have not cited any Missouri authority for the proposition that a consortium award may exceed by a factor of five the damages awarded to the

-12-

injured spouse. In <u>Hodges v. Johnson</u>, the Missouri Court of Appeals observed that "[t]here should be some reasonable relationship between the size of a verdict awarded in a consortium action and that given the injured spouse," and that "[i]n the usual case, . . . the damages to the uninjured spouse are necessarily considerably less than those suffered by the one injured." 417 S.W.2d at 693. To be sure, this is not the usual case. However, this court is not aware of a single Missouri case in which the consortium award to the uninjured spouse exceeded the damages judgment to the principal plaintiff. To the contrary, the Supreme Court of Missouri has suggested that the extent of the uninjured spouse's recovery for loss of consortium "depends, in large measure," upon the extent of the injured spouse's injuries. <u>State ex rel. St. Louis Pub. Serv. Co. v. McMullan</u>, 297 S.W.2d 431, 436 (Mo. 1956) (en banc) ("It is true that the wife's claim for her own injuries, and the husband's claim for expenses and loss of services and society are separate claims. . . . [But t]he real point is that the separate claim of the husband arises directly *out of*, and *is based directly on*, the wife's personal injuries. Were it not for those injuries he would have no suit, and upon the extent of those injuries depends, in large measure, the extent of his recovery for a loss of services and society." (emphasis in original)). Thus, we do not believe that state precedent foreshadows a disproportionately large consortium claim of the sort awarded to Calvin by the district court.

Finally, the Supreme Court of Missouri has previously recognized some limits on the concept of consortium. <u>See</u> <u>Powell v. Am. Motors Corp.</u>, 834 S.W.2d 184, 191 (Mo. 1992) (en banc) (refusing to recognize a cause of action for parental or filial consortium). In <u>Powell</u>, the Supreme Court of Missouri held that "creat[ing] an action for parental or filial consortium . . . is a matter of public policy," and that "[q]uestions of public policy are to be determined by the legislature." <u>Id.</u> Therefore, we think it unlikely that, absent legislative action, the Supreme Court of Missouri would expand the concept of consortium to include a claim for lifetime professional nursing services that vastly exceeds the underlying award to the injured spouse. Consequently, it is not our role to do so. <u>Ashley Cnty.</u>, 552 F.3d at 671 (refusing to expand Arkansas law to

recognize a cause of action previously unrecognized by Arkansas courts); accord Birchler v. Gehl Co., 88 F.3d 518, 521 (7th Cir. 1996) ("When we are faced with opposing plausible interpretations of state law, we generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability."); Pearson v. John Hancock Mut. Life Ins. Co., 979 F.2d 254, 259 (1st Cir. 1992) (plaintiffs who chose a federal forum "cannot justifiably complain if the federal court manifests great caution in blazing new state-law trails"); Villegas v. Princeton Farms, Inc., 893 F.2d 919, 925 (7th Cir. 1990) ("Federal court is not the place to press innovative theories of state law." (internal quotation marks omitted)).[3] Accordingly, we reverse the consortium award to Calvin as contrary to Missouri law.

We remand Calvin's loss-of-consortium claim for reconsideration by the district court. While professional nursing services are not encompassed by the notion of consortium under Missouri law, Calvin's invalid status and Paula's former role as his primary care-giver are not entirely irrelevant to Calvin's loss-of-consortium claim. A consortium award seeks to compensate for the domestic services that have been lost.

---

[3]Dillard's argues further that the consortium award violated Missouri's rule that a party cannot be compensated twice for the same injury. According to Dillard's, Calvin already recovered the cost of lifetime healthcare in the settlement of his 1982 litigation. Because the settlement agreement is not included in the record, it is impossible for this court to determine whether any part of the settlement amount was intended to compensate Calvin for future nursing costs, nor is it possible to know whether Calvin signed a full release of all his claims, including for lifetime medical care. See Hails v. Sys. Constructors, Inc., 407 S.W.2d 583, 589 (Mo. Ct. App. 1966) ("[A] claimant may settle with one of two or more joint tort-feasors and release that particular joint tort-feasor from further liability, and still hold and sue the others for the balance of his damages. . . . But if the release is in full of all damages, . . . then the cause of action is dead and cannot be revived."). However, because we find that the district court erred in concluding that recovery for the cost of life-long professional care-giving services is permissible on a consortium claim under Missouri law, we need not reach the double-recovery argument advanced by Dillard's.

Thus, an invalid spouse might be entitled to a greater recovery than a healthy spouse if his injured wife had previously been undertaking a greater share of the household services that are encompassed by the notion of consortium. See Gooch, 340 S.W.2d at 670; Messina, 42 S.W.3d at 758; O'Neal, 8 S.W.3d at 242. Additionally, an invalid's spouse might have previously been providing services not required by a healthy spouse yet falling short of professional nursing care. These services, such as, for example, driving the invalid to medical appointments, picking up medications, or assisting the invalid with basic personal care and hygiene, seem to us to belong to the category of "services" for whose loss an uninjured spouse may recover on a consortium claim. Therefore, we predict that the Supreme Court of Missouri would permit a higher consortium award when, as here, the uninjured spouse is an invalid. Still, there "should be some reasonable relationship between the size of a verdict awarded in a consortium action and that given the injured spouse," Hodges, 417 S.W.2d at 693, and it would be a highly unusual case in which the consortium award exceeded the damages award to the principal plaintiff.

## III. Conclusion

For the reasons stated above, we affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion. We affirm as to the award of damages to Paula and reverse as to the award of damages to Calvin. We remand Calvin's loss-of-consortium claim to the district court with instructions to reconsider its judgment.

_____

-15-